RAYMOND L. WEILAND AND DOROTHY J. WEILAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weiland v. Commissioner
Docket No. 3756-80.
United States Tax Court
T.C. Memo 1982-601; 1982 Tax Ct. Memo LEXIS 145; 44 T.C.M. (CCH) 1396; T.C.M. (RIA) 82601; October 14, 1982. Raymond L. Weiland, pro se. John L. Hopkins, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and an addition to tax under section 6651(a)(1)[1] as follows: *146 Sec. 6651(a)(1)
Year
Deficiency
Addition to Tax
1974
$1,576.85
1975
918.57
$322.14
The issues for decision are: 1. Whether certain amounts received by petitioner Raymond L. Weiland in 1974 and 1975 from a corporation of which he was the president and controlling shareholder were salary payments or nontaxable loans, and 2. Whether petitioners are liable for an addition to tax pursuant to section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. During the taxable years involved in this case petitioners were husband and wife. However, at the time they filed their petition in this case, they were divorced, with petitioner Raymond L. Weiland residing at 608 Norris Avenue, Nashville, Tennessee, and petitioner Dorothy J. Weiland residing at 439 Huntington Ridge, Nashville, Tennessee. Petitioners filed their joint Federal income tax returns for 1974 and 1975 with the Internal Revenue Service Center in Memphis, Tennessee. The envelopes containing the tax returns each bore a postmark of March 25, 1977. The tax returns *147 were stamped "received" by the Internal Revenue Service March 28, 1977 and April 5, 1977, respectively. Since petitioner Dorothy J. Weiland is a party to this case solely because she signed joint returns with her husband, the term petitioner will refer to Raymond L. Weiland. From June 1974 until the present, petitioner was the president and controlling shareholder of International Nuclear Corporation (INC). The corporation specialized in the production of electronic equipment mostly for use by radio and television stations. Petitioner had been president of INC from 1960 through 1971 when he quit because of a disagreement between himself and other shareholders. In June 1974 petitioner and Bob Bethel arranged to take control of INC. Petitioner held 26 1/2 percent of the stock which he had owned since the inception of the corporation. The corporation redeemed all of the other stock leaving petitioner with 100 percent of the outstanding stock. Petitioner apparently guaranteed the bank loan that the corporation obtained to accomplish the stock redemption. After the redemption, Bethel received enough shares of stock so that he became a 30 percent owner, with petitioner owning *148 70 percent of the stock of INC. Petitioner was the president and Bethel was the vice president. The corporation was heavily in debt and struggling along month by month when petitioner and Bethel took over the business. Petitioner and Bethel knew that if INC did not begin to make more money, it would be necessary for the corporation to obtain additional funds. [2] Petitioner had about $150,000 he had earned and saved while working for INC during the 1960's, which he was willing to lend to INC on a short-term basis. Petitioner spent between 40 and 60 hours per week working for INC. Ninety-five percent of his time was spent in production and engineering, and the remaining five percent was spent in contacting customers. Other than the nine checks in issue in this case, petitioner did not receive any compensation or dividends from INC during 1974 or 1975. There are a total of nine checks at issue here. Each check was in the amount of $1,412.25 and was drawn on an INC account. They *149 were received by petitioner on June 17, 1974, August 5, 1974, September 3, 1974, October 18, 1974, November 1, 1974, December 6, 1974, January 6, 1975, February 7, 1975, and March 10, 1975. The checks were numbered 22, 209, 1005, 1039, 1050, 1070, 1092, 1112, and 1126, respectively. [3] Each of the check stubs reflects the following: "Total Earn $1,500," "F.I.C.A. $87.75," "Total Deductions $87.75," "Net Pay $1,412.25." The checks were signed either by Bob Bethel or petitioner. There was no written agreement between petitioner and INC concerning the repayment of the amounts of the above checks. Petitioner did not agree to pay and did not pay any interest on those funds. In April of 1975, petitioner began advancing money to INC to pay the salaries of Bethel and the other employees. By August 22, 1975, petitioner had advanced a total of $116,800 to INC, and *150 ultimately may have advanced as much as $130,000 to $140,000 to INC. At first no interest was paid by INC on money advanced by petitioner but some time shortly before the trial of this case, INC began paying interest to petitioner. No part of these advances is involved in this case, and we do not decide whether these amounts were loans or contributions to capital. An entry in INC's ledger, dated August 31, 1975, debited $9,000 to accounts payable officer and credited $9,000 to retained earnings. The explanatory note stated that the entry was made to forgive accrued salaries payable to petitioner for the year ending August 31, 1975 and stated that the salary will not be paid. That amount does not include the payments that were actually made to petitioner in calendar year 1975, nor the $9,000 payments deducted by INC on its corporate return for its fiscal year ended August 31, 1975. INC filed its corporate income tax returns (Forms 1120) for taxable years ending August 31, 1974 and 1975, which were stamped received by the Internal Revenue Service on December 4, 1974 and November 3, 1975, respectively. On Schedule E of these returns, INC reported and deducted as compensation *151 to officers $4,500 each to petitioner and to Bethel in 1974 and $9,000 to petitioner and $18,000 to Bethel in 1975. The corporation reported a loss of $51,340.03 for taxable year ending August 31, 1974 and a loss of $46,875.74 for 1975. Beginning in early March of 1976, petitioner was contacted by one of respondent's agents about his 1974 individual return that had not yet been filed. Petitioner had made a partial payment of his tax along with his earlier request for an extension of time to file, but had not filed the return within the extended period. The agent contacted petitioner several times in 1976 about the matter. The minutes of a special meeting of the board of directors of INC, dated August 31, 1976, reflected the acceptance of the following resolution: Resolved, that although it is not intended that Raymond Weiland will receive a salary until the corporation returnes (sic) to profitable operations, an accrual will be made to reflect officer's salary expense for financial purposes only. The minutes of another special meeting of the board of directors of INC, dated December 31, 1976, reflected the acceptance of the following resolutions: Resolved, that $3000.00 *152 of payments to Raymond Weiland paid during fiscal year ending 8/31/74 be applied against the amount of debt the Corporation owes to Raymond Weiland.These payments were formerly taken as deductions to the Corporations (sic) taxable income as officer's salaries. The retroactive salary adjustment will reduce International Nuclear's loss carryforward by the same amount. Further resolved, that $9,000.00 of payments to Raymond Weiland during fiscal year ending 8/31/75, shall also be treated as a reduction against the debt the Corporation owes Raymond Weiland. The retroactive salary adjustment shall also reduce the Corporation's loss carryforward as described above. The inquiries from respondent's agent continued and were expanded to cover both the 1974 and 1975 individual returns that petitioner had still not filed. After eight unsuccessful contacts, petitioner's case was referred to audit just about the time his delinquent returns were finally filed. Shortly before those individual returns were filed, the corporation filed amended returns. On January 12, 1977, INC filed amended returns for 1974 and 1975. On these amended returns, INC claimed decreases in expense deductions for *153 officer's salaries of $3,000 for 1974 and $9,000 for 1975. Each amended return stated that the claimed deduction for officer's salaries had been excessive because of the corporation's large losses and that the amended returns reflected "a retroactive salary adjustment." Since the corporation had reported a loss for each of the years in issue upon its original returns, the effect of the amended returns was to reduce the loss carryover available to the corporation. Respondent disallowed the adjustments proposed by the amended returns. INC also filed three claims for refund or abatement of employment taxes: the first for $351 attributable to taxes INC had paid on October 30, 1974, for the period July 1 to September 30, 1974; the second for $526.50 attributable to taxes paid on January 3, 1975, for the period October 1, 1974 to December 31, 1974; and the third for $526.50 attributable to taxes paid on April 30, 1975, for the period January 1, 1975 to March 31, 1975. Each of these refund claims stated as the reason for the claim that salary paid to petitioner "was retroactively adjusted and applied" to note payments to petitioner for advances he had made to the corporation. Respondent *154 disallowed the claims for the third and fourth quarters of 1974 based upon the expiration of the statute of limitations on claims for refunds. Respondent abated a tax assessment in the amount of $526.50 for employment taxes for the first quarter of 1975 as a result of INC's claims. Petitioner was granted extensions of time until June 15, 1975 to file his Federal income tax return for 1974 and until October 15, 1976 to file his Federal income tax return for 1975. The envelopes containing his returns were each postmarked March 25, 1977. Petitioner testified that the reason he was late in filing his 1974 and 1975 Federal income tax returns was "because I was very much involved in a very messy divorce and separation. I was on the City Council of the City of Brentwood, just outside of Nashville, and I was trying to save a bankrupt company, and I just did not have any more time available to get these things put together properly for a proper, timely filing." On his tax returns as filed for 1974 and 1975, petitioner deducted certain employee business expenses as an executive of INC but reported no income from INC for either year. On audit respondent determined that petitioner received *155 salary from INC in the amounts of $9,000 and $4,500 for 1974 and 1975, respectively. [4] The net amounts actually received by petitioner were $8,473.50 for 1974 and $4,236.75 for 1975, which represented the nine net payments (less FICA withheld). OPINION The issue here is whether certain payments from a corporation of which petitioner was the president and majority stockholder constituted salary or nontaxable loans. Petitioner received checks from INC totaling $8,473.50 in 1974 and $4,236.75 in 1975. The corporation had withheld FICA taxes from the gross amounts paid to petitioner. INC also claimed the payments to petitioner as a deduction for salary expenses on its tax returns in both years. Respondent determined that petitioner received $9,000 in 1974 and $4,500 in 1975 (including FICA) as compensation for services which amounts were includable in petitioner's gross income under section 61(a)(1). Petitioner insists that all of these amounts represented loans to him from the corporation. *156 Whether the amounts received by petitioner were nontaxable loans or taxable compensation is a question of fact. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Fisher v. Commissioner,54 T.C. 905 (1970); Haber v. Commissioner,52 T.C. 255 (1969), affd. 422 F. 2d 198 (5th Cir. 1970). Cf.Chism's Estate v. Commissioner,322 F. 2d 956 (9th Cir. 1963). The question is whether a bona fide debtor-creditor relationship existed. The resolution of the question depends on the existence of an actual intent at the time the checks were given to petitioner that the money be repaid to the corporation, an intent on the part of the recipient to repay and an intent on the part of the corporation to enforce repayment. Berthold v. Commissioner,404 F. 2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,supra at 959-960; Fisher v. Commissioner,supra at 909-910; Haber v. Commissioner,supra at 266. Intent is rarely susceptible of *157 proof by direct evidence so we consider a number of factors to determine the intent. Dean v. Commissioner,57 T.C. 32, 43-44 (1971). Some of these factors include the issuance of notes or other evidence of indebtedness, the presence of a maturity date, the provision for and payment of interest, and the presence of collateral or other security. See e.g., Berthold v. Commissioner,supra;Dean v. Commissioner,supra;Haber v. Commissioner,supra.
In this case all of the factors indicate there was no bona fide intent that petitioner repay the money to INC. The corporation issued no notes or other evidence of indebtedness. There was no provision for any payment of interest by petitioner. There was no fixed maturity date or security arrangement provided. Petitioner as the 70 percent shareholder of INC controlled its affairs. He spent 40 to 60 hours per week performing services for the corporation, and received no compensation other than the payments here in issue. The payments to petitioner were periodic.The corporation made the payments from its payroll account, withheld FICA taxes, and deducted *158 the payments as salary expense on the corporation's income tax returns. In these respects, the facts are similar to those of Beaver v. Commissioner,supra, in which we held the payments were salary and not loans; see also Haber v. Commissioner,supra;Groves v. Commissioner,38 B.T.A. 727 (1938). Petitioner argues that he did have an actual intent to repay INC, an intent present at the time the checks were given to him. In support of his argument he cites an alleged agreement with Bethel that he (petitioner) would take no salary until the corporation was profitable. He argues that the bookkeeper erroneously reported the advances as salary and not loans. Neither Bethel nor the bookkeeper testified, and we have only petitioner's self-serving and wholly unsupported testimony as to these points. [5] The resolutions passed by the board of directors of INC occurred in 1976, long after the payments to petitioner were made, and thus carry little weight toward establishing that the payments were loans from the outset. These corporate resolutions also occurred after one of respondent's agents had already contacted petitioner *159 about his 1974 and 1975 individual tax returns that had not yet been filed. Petitioner's testimony at best evidence hi subjective or declared intent to repay. However, his self-serving declarations must be "balanced against the surrounding circumstances," and "[a] declared intent to repay is insufficient if it fails to jibe with the undisputed facts indicating the intrinsic economic nature of the transaction." Williams v. Commissioner,627 F. 2d 1032, 1034 (10th Cir. 1980), affg. a Memorandum Opinion of this Court. In this case all of the objective factors indicate that petitioner was paid a salary for valuable services he performed for INC. Moreover, considering INC's bad financial condition throughout this period, it is unreasonable to suggest that petitioner would borrow money from the corporation or that the corporation would lend *160 money to him at that time. And the Court found petitioner's explanation of why he was taking money out of the corporation wholly unconvincing. [6] While petitioner apparently did give INC an infusion of funds (either loans or contributions to capital) beginning about April of 1975, we are satisfied that the nine payments involved in this case were originally intended to be and were salary to petitioner. The effort to recast these payments as loans rather than salary developed much later and seemingly in response to respondent's inquiry about petitioner's then unfiled 1974 and 1975 tax returns. *161 Respondent has determined that petitioner is responsible for an addition to tax for 1975 as provided in section 6651(a)(1). [7]Section 6651(a)(1) provides for an addition to tax for failure to file a return when it is due "unless it is shown that such failure is due to reasonable cause and not willful neglect." Petitioner has the burden of proof with respect to this issue. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1342 (1971), affd. without published opinion 496 F. 2d 876 (5th Cir. 1974); Bebb v. Commissioner,36 T.C. 170, 173 (1961). Petitioner was granted an extension of time until October 15, 1976 within which to file his 1975 return. The envelope containing this return was postmarked March 25, 1977. The only evidence presented to establish reasonable cause for petitioner's late filing was his testimony that he was involved in a messy divorce and separation, *162 that he was on the City Council, that he was trying to save a bankrupt company, and that he "just did not have any more time available to get these things put together properly for a proper, timely filing." However, these facts do not establish reasonable cause for the delay. It is well established that a plea of being "too busy" is insufficient to relieve a taxpayer of his obligation to timely file his tax return. Dustin v. Commissioner,53 T.C. 491, 507 (1969), affd. 467 F. 2d 47, 50 (9th Cir. 1972). Respondent's imposition of the addition for late filing is sustained. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved in this case, unless otherwise indicated.↩
2. While petitioner testified that he knew he would have to "lend" the corporation money, the Court declines to speculate whether any such infusion of funds would have been debt or equity.↩
3. The Court was not furnished with copies of the checks themselves, but with copies of the check stubs. The check stub for check number 1005 is dated September 3, 1975. We are satisfied, however, that the correct date should be September 3, 1974, which would be consistent with the terms of the parties' stipulation.↩
4. These increases in adjusted gross income also resulted in automatic adjustments to petitioner's medical expense and general sales tax deductions.↩
5. The testimony of an accountant who attempted to corroborate portions of petitioner's story was inconsistent with his own prior written statement and we have disregarded this testimony as unworthy of belief. This part-time accountant admitted he did not learn about the alleged error in the corporate books until 1979.↩
6. Petitioner testified that Bethel, the 30 percent stockholder, had a family and needed income to live on whereas he did not-- But in order to make things fairer to both of us, we--we made this agreement that any money he takes out I would borrow an equal amount. Now, if you wonder why I wanted to milk the company that way by borrowing it is because it was--it was my method of trying to make Bob [Bethel] feel more comfortable working with me where he wasn't taking everything and he was giving everything. Bethel did not appear at the trial and the Court excluded as hear-say an unsworn "To Whom It May Concern" statement proffered by petitioner.↩
7. The return for 1974 was also filed late, but petitioner had made a deposit or payment along with his request for an extension of time to file that return.↩